IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

WILLIE MENARDO MCKINNON,
      Plaintiff,

vs.                           Case No.: 3:18cv1191/LAC/EMT

B. HULLETT, et al.,
      Defendants.
_____/

## REPORT AND RECOMMENDATION

This matter is before the court on Defendants' motion for summary judgment (ECF No. 125). The court advised Plaintiff of the procedural rules and legal standard governing summary judgment motions (*see* ECF No. 128). The court set an initial deadline of December 6, 2019, for Plaintiff to file a response to the motion for summary judgment (*see id.*). At Plaintiff's request, the court twice extended the deadline, with the last deadline being January 31, 2020 (*see* ECF Nos. 129, 130, 131, 132). As of the date of the Report and Recommendation, Plaintiff has not filed a response.

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). Upon consideration of the parties' submissions and the relevant law, the

undersigned concludes that Defendants' motion for summary judgment should be granted in part and denied in part.

## I.    BACKGROUND

Plaintiff Willie Menardo McKinnon ("McKinnon"), an inmate of the Florida Department of Corrections ("FDOC") proceeding pro se and in forma pauperis, commenced this case on April 26, 2018, by filing a civil rights complaint under 42 U.S.C. § 1983 (ECF No. 1).   Presently before the court is McKinnon's Third Amended Complaint (ECF No. 84).   McKinnon names ten Defendants:  (1) Julie Jones, former Secretary of the FDOC, (2) Angela Gaskins, the FDOC's Dietician, (3) W. Clemmons, Warden of Santa Rosa Correctional Institution, (4) B. Hullett, a sergeant at Santa Rosa C.I., (5) J. Tuttle, a correctional officer at Santa Rosa C.I., (6) F. Scheier, a correctional officer at Santa Rosa C.I., (7) J. Carrico, a correctional officer at Santa Rosa C.I., (8) C. Jackson, a correctional officer at Santa Rosa C.I., (9) Centurion of Florida, LLC ("Centurion"), a private medical services provider under contract with the FDOC to provide medical services to FDOC inmates, and (10) M. Williams, a nurse at Santa Rosa C.I. employed by Centurion (*see id.* at 1–5).

McKinnon claims that Defendant Gaskins violated his Eighth Amendment rights by implementing a policy which revoked a 2,800-calorie therapeutic diet

(which included a snack between meals) for diabetic inmates (*see* ECF No. 84 at 17–18).  McKinnon contends this policy caused him to suffer a hypoglycemic episode on December 13, 2017 (*id.*).  McKinnon claims that Warden Clemmons and former Secretary Jones had a policy or custom of prioritizing "count" over inmates' emergency medical needs  (*id.* at 17).  McKinnon claims that Defendants Tuttle, Jackson, Hullett, Scheier, and Carrico violated his Eighth Amendment rights by delaying medical treatment for the December 13 hypoglycemic episode (*id.* at 14–17).  McKinnon alleges Defendants' conduct caused him physical and emotional distress (*id.* at 14–18).  As relief, McKinnon seeks compensatory, punitive, and nominal damages (*id.* at 18).  McKinnon also seeks injunctive relief, specifically, an order (1) abolishing the FDOC's policy of prioritizing "count" over the provision of medical treatment to inmates, (2) re-implementing the 2,800-calorie therapeutic diet, including snacks between meals, (3) requiring the FDOC to house all diabetic inmates at Santa Rosa C.I. and other Close Management institutions in the same housing unit, and (4) establishing a "response time" for treatment of hypoglycemic emergencies (*id.*).

All Defendants were served with process.  On August 14, 2019, the district court dismissed McKinnon's claims against Centurion and Nurse Williams (ECF No. 112).  The remaining Defendants contend they are entitled to judgment in their

favor on the following grounds: (1) McKinnon's contemporaneously written medical records contradict his allegations; (2) McKinnon's allegations fail to state a cognizable Eighth Amendment claim; (3) McKinnon is barred from recovering compensatory or punitive damages for alleged emotional injury; (4) McKinnon is unable to establish the necessary factors for issuance of a permanent injunction; (5) McKinnon's official capacity claims for monetary damages are barred by the Eleventh Amendment; and (6) McKinnon's individual capacity claims for monetary damages are barred by qualified immunity (ECF No. 125).

## II.    SUMMARY JUDGMENT STANDARD

To prevail on a motion for summary judgment, the moving party must show that the nonmoving party has no evidence to support his or her case or present affirmative evidence that the nonmoving party will be unable to prove his or her case at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). If the moving party successfully negates an essential element of the nonmoving party's case, the burden shifts to the nonmoving party to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*, 477 U.S. at 248.  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.*

Further, the nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  Speculation or conjecture from a party cannot create a genuine issue of material fact.  *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).  And "[a] mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment."  *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004); *see also Celotex Corp.*, 477 U.S. at 324.  The nonmoving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  *See Celotex Corp.*, *supra*; *Owen v. Wille*, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts

showing that there is a genuine issue for trial); *Hammer v. Slater*, 20 F.3d 1137 (11th Cir. 1994).

Regarding the factual positions asserted by the parties, the court must apply the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> **(1) Supporting Factual Positions**. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
> . . . .
> **(4) Affidavits or Declarations**. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

Facts asserted in hearsay statements which are not subject to a hearsay exception, and thus would not be admissible in evidence, are insufficient to show that a fact is genuinely disputed. "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012)

(citing *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996)).  If a fact cannot be presented in a form that would be admissible in evidence, it cannot be used for purposes of summary judgment.  *See Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999); Fed. R. Civ. P. 56(c).

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment or grant summary judgment if the moving party's motion and supporting materials— including the facts considered undisputed—show that the moving party is entitled to it.  *See* Fed. R. Civ. P. 56(e)(2, 3).

Evidence presented by the nonmoving party in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him or her.  *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *Jones v. Cannon*, 174 F. 3d 1271, 1282 (11th Cir. 1999).  Nonetheless, the nonmoving party still bears the burden of coming forward with sufficient evidence of every element that he or she must prove.  *See Celotex Corp.*, 477 U.S. at 317.  A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any

material fact and that the movant is entitled to judgment as a matter of law." Fed.
R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322.

## III.  MATERIAL FACTS

As this case comes before the court on Defendants' motion for summary
judgment, the court is required to view the facts in the light most favorable to
McKinnon, the nonmoving party.  *See Hairston v. Gainesville Sun Publ'g Co.*, 9
F.3d 913, 918 (11th Cir. 1993); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.
Ct. 1937, 173 L. Ed. 2d 868 (2009).  The court does so here, referring to McKinnon's
verified Third Amended Complaint, and taking those facts from the parties'
pleadings and summary judgment materials of record.  *See Perry v. Thompson*, 786
F.2d 1093, 1095 (11th Cir. 1986) (holding that specific facts pled in a sworn
complaint must be considered in opposition to summary judgment); Fed. R. Civ. P.
56(c); N.D. Fla. Loc. R. 56.1(B), (C), (F).  Matters stated below as "facts" for
purposes of summary judgment may not be the actual facts.  *See Montoute v. Carr*,
114 F.3d 181, 182 (11th Cir. 1997).

On December 13, 2017, at approximately 11:20 a.m., Defendants Tuttle and
Jackson entered Wing 2 of G-dormitory to provide lunch to inmates (Third Amended
Complaint at 9).  Tuttle and Jackson knew that McKinnon was diabetic and at risk
for hypoglycemia (*id.*).  McKinnon was housed on the first floor in cell 117 (*id.*).

Several inmates informed Tuttle and Jackson that McKinnon was "unresponsive" in his cell (*id.*). Tuttle and Jackson went to McKinnon's cell and saw him lying "unresponsive" in his cell (*id.*). Tuttle and Jackson proceeded to serve lunch to other inmates on the first floor (*id.*). When Tuttle and Jackson arrived at McKinnon's cell to serve him lunch, McKinnon was still unresponsive (*id.*). Tuttle and Jackson left McKinnon's food tray at his cell, continued to distribute trays on the first floor, and then distributed food trays to the upper floor of the housing unit (*id.*). After distributing lunch to the entire wing, Tuttle and Jackson returned to McKinnon's cell and radioed to the control room to open the door of McKinnon's cell (*id.*). While Tuttle and Jackson stood outside the cell, they allowed another inmate to enter McKinnon's cell to attempt to treat McKinnon's condition (apparently by attempting to feed McKinnon) (*id.*).

Defendant Hullett observed the open door of McKinnon's cell (Third Amended Complaint at 10). McKinnon was lying on his back immobile, choking on his tongue and on saliva (*id.*). Hullett knew that McKinnon was diabetic (*id.*). Hullett ordered the inmate to leave McKinnon's cell and ordered "everyone" to leave Wing 2 (*id.*). Other inmates began banging on their cell doors, yelling, "Man down! 17 bottom!" (*id.*). Minutes later, Hullett returned to Wing 2 and acted as if he was conducting a security check (*id.*). Hullett went to McKinnon's cell and attempted to

elicit a response from McKinnon (*id.*). Other inmates yelled, "Sarge, you see he can't move!", "He's incoherent!", and "You're just standing there, do something!" (*id.*). Hullett responded with expletives and then left Wing 2 (*id.*).

More time passed as other inmates yelled for help (Third Amended Complaint at 11). Defendants Officers Scheier and Carrico entered the wing (*id.*). Scheier was aware that McKinnon was diabetic and at risk for hypoglycemia (*id.*). Other inmates notified Scheier and Carrico that McKinnon was unresponsive and needed immediate medical attention (*id.*). The officers yelled, "Count is more important!" (*id.*). Scheier and Carrico commenced the count, and when they reached McKinnon's cell, they saw his condition and proceeded with the count (*id.*).

When count concluded, Defendant Hullett and another officer secured McKinnon with handcuffs and leg restraints, placed him in a wheelchair, and transported him to the dormitory's medical triage room (Third Amended Complaint at 11). McKinnon was unable to walk, stand, speak, or lift his head (*id.*).

McKinnon arrived at the medical triage room at 12:00 p.m. (Declaration of Dr. Kalem Santiago ¶¶ 4–7, attached medical records, ECF No. 125-3 at 30).[1] Defendant Nurse Williams observed that McKinnon was symptomatic, specifically,

---

[1] References to McKinnon's medical records are to the page numbers automatically assigned by the court' electronic filing system.

confused, lethargic, and not responsive to her commands (*id.*).  Nurse Williams exclaimed, "Oh my God! He's one step away from a coma!" (Third Amended Complaint at 12).

In accordance with the FDOC's Diabetes Protocol for Hypoglycemia (i.e., blood sugar less than 70), Nurse Williams measured McKinnon's blood sugar level and determined that it was 43 (McKinnon's medical records, ECF No. 125-3 at 30). Also in accordance with the Diabetes Protocol, Nurse Williams administered a tube of oral glucose at 12:03 p.m. (*id.*).  Sergeant Hullett walked into the triage room and told Nurse Williams that McKinnon needed to be returned to his cell as soon as possible, because the warden was coming to the dormitory for an inspection, and Hullett "wanted to look good for the warden" (Third Amended Complaint at 12).

Sergeant Hullett wheeled McKinnon from the dormitory's medical triage room to McKinnon's cell, even though McKinnon was still suffering from hypoglycemia and could not walk, talk, stand, or lift his head (Third Amended Complaint at 12–13).  Hullett lifted McKinnon out of the wheelchair, dragged him into the cell, and placed him on his bunk while fully restrained (*id.*).  McKinnon was left unattended in his cell (*id.*).  He moaned for help, while other inmates yelled in an attempt to get the attention of security officers (*id.*).  McKinnon fell off his bunk and was stuck on his back fully restrained "in positional asphyxiation" (*id.* at 13).

Warden Clemmons and other supervisors came to the Wing for inspection (Third Amended Complaint at 13).  Captain Parratt saw McKinnon and immediately radioed for the door of McKinnon's cell to be opened (*id.*).  McKinnon was again taken to the medical triage room, where Nurse Williams checked his blood sugar level at 12:30 p.m. (McKinnon's medical records, ECF No. 125-3 at 30).  McKinnon's blood sugar level was 56 (McKinnon's medical records, ECF No. 125-3 at 30–31).  In accordance with the Diabetes Protocol, Nurse Williams administered another tube of oral glucose at 12:35 p.m. (*id.*).  McKinnon's blood sugar level was next checked at 2:00 p.m. by Nurse Box, at which time it registered at 93 or 94 (McKinnon's medical records, ECF No. 125-3 at 31, 34–35).  According to the Diabetes Protocol, no treatment is required if the inmate's blood sugar level is above 70 (*see id.*).

Dr. Kalem Santiago, a medical doctor and the Chief of Medical Service for the FDOC, reviewed McKinnon's medical records (Santiago Decl. ¶¶ 1, 3).  According to Dr. Santiago, McKinnon's medical care was not delayed after his initial arrival at the medical triage room at 12:00 p.m. on December 13, 2017 (Santiago Decl. ¶ 15).

With respect to McKinnon's therapeutic diet, Dr. Santiago states that McKinnon's diabetes has been in fair to poor control, caused primarily by

McKinnon's lack of compliance with his medical treatment, even when he has been receiving a regulated therapeutic diet (Santiago Decl. ¶ 19).  Dr. Santiago states that from February 23, 2017 until August 23, 2017, McKinnon had a 2,800-calorie therapeutic diet consisting of three meals and three snacks (Santiago Decl. ¶¶ 11, 12).  During that six-month time period, McKinnon had eighteen (18) episodes of hypoglycemia and six (6) episodes of hyperglycemia (*id.*).  During one of those hypoglycemic episodes, on August 11, 2017, McKinnon reported to the attending physician that he "sold his food to buy paper" (Santiago Decl. ¶ 13).  At the time of the hypoglycemic episode at issue in this case, December 13, 2017, McKinnon had a 2,600-calorie therapeutic diet consisting of three meals and one bedtime snack (Santiago Decl. ¶ 10).  Dr. Santiago opines that there is no evidence that the therapeutic diet that McKinnon requests in the instant case (a 2,800-calorie therapeutic diet with three meals and three snacks) will improve his blood sugar stability, since McKinnon had several hypoglycemic episodes even while he was on that diet, and the diet did not prevent them (Santiago Decl. ¶¶ 9, 14, 16).

## IV.    DISCUSSION

The Eighth Amendment prohibits infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII.  Stating a claim under the clause thus requires satisfying two minima (from which the case law has ultimately derived four

requirements).  First, there must be, objectively speaking, conduct by public officials "sufficiently serious" to constitute a cruel or unusual deprivation—one "denying 'the minimal civilized measure of life's necessities.'"  *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)).  Second, there must be a subjective intent by the public officials involved to use the sufficiently serious deprivation in order to punish.  *See Wilson*, 501 U.S. at 300 ("The source of the intent requirement is not the predilections of this Court, but the Eighth Amendment itself, which bans only cruel and unusual punishment.  If the pain inflicted is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify." (emphasis in original)).

In the context of denial of medical care, each of these minima has been more specifically described as encompassing two subsidiary requirements.  To show an objectively serious deprivation, it is necessary to demonstrate, first, an objectively "serious medical need[ ]," *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976), one that, if left unattended, "pos[es] a substantial risk of serious harm," *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).  A serious medical need is "one that has been diagnosed by a physician as

mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). Second, it is necessary to demonstrate that the response made by the public official to that need was poor enough to constitute "an unnecessary and wanton infliction of pain," and not merely accidental inadequacy, "negligen[ce] in diagnosi[s] or treat[ment]," or even "[m]edical malpractice" actionable under state law. *Estelle*, 429 U.S. at 105–06. Similarly, to show the required subjective intent to punish, a plaintiff must demonstrate that the public official acted with an attitude of "deliberate indifference," *Id.* at 105, which is in turn defined as requiring two separate things: "aware[ness] of facts from which the inference could be drawn that a substantial risk of serious harm exists and . . . draw[ing of] the inference," *Farmer*, 511 U.S. at 837. Ultimately, there are thus four requirements: an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts. *See Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000).

Eleventh Circuit cases have given substance to *Estelle*'s distinction between "deliberate indifference" and mere negligence, explicating categories of action or inaction that may constitute deliberate indifference. The Eleventh Circuit repeatedly found that an official acts with deliberate indifference when he or she knows that an

inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate. *McElligott*, 182 F.3d at 1255 (citations omitted).

"Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott*, 182 F.3d at 1255; *see also Harris v. Coweta Cnty.*, 21 F.3d 388, 393–94 (11th Cir. 1994) ("The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay. A few hours' delay in receiving medical care for emergency needs such as broken bones and bleeding cuts may constitute deliberate indifference."); *see also Farrow v. West*, 320 F.3d 1235, 1246 (11th Cir. 2003) (a defendant who delays necessary treatment for non-medical reasons may exhibit deliberate indifference); *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) ("[A]n unexplained delay of hours in treating a serious injury states a prima facie case of deliberate indifference.").

## A.    Defendant Gaskins

McKinnon claims that Defendant Gaskins, the FDOC's Dietician, caused his hypoglycemic episode on December 13, 2017, because she modified the FDOC's

therapeutic diet for diabetic inmates by reducing it from a 2,800-calorie diet consisting of three meals and three snacks to a 2,600-calorie diet consisting of three meals and one bedtime snack (Third Amended Complaint at 17–18).

McKinnon has failed to demonstrate a genuine issue of material fact as to whether his hypoglycemic episode was caused by his lack of a 2,800-calorie diet consisting of three meals and three snacks. Dr. Santiago opined that there is no evidence that the 2,800-calorie therapeutic diet that McKinnon requests will improve his blood sugar stability, since McKinnon had several hypoglycemic episodes while he was on that diet, and the diet did not prevent them. McKinnon has not proffered any medical evidence which disputes Dr. Santiago's opinion. Considering the absence of evidence that a 2,800-calorie diet consisting of three meals and three snacks would have prevented McKinnon's hypoglycemic episode, McKinnon has failed to state an Eighth Amendment claim against Defendant Gaskins. Gaskins is thus entitled to summary judgment in her favor.

**B.      Defendants Jones and Clemmons**

McKinnon claims that former Secretary Jones and Warden Clemmons caused a delay in his medical treatment for his hypoglycemic episode because they implemented a custom or policy of prioritizing "count" over inmates' medical needs.

Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior.  *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) (finding no vicarious liability for a municipal "person" under 42 U.S.C. § 1983).  "Because vicarious liability is inapplicable to [ ] § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.  Under *Iqbal*, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."  *Id.* at 677.  "[S]upervisors are liable under [section] 1983 'either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation.'"  *Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013) (quoting *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010)).  Facts sufficient to establish a causal connection include those "which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."  *Keating*, 598 F.3d at 762 (internal quotation omitted).

McKinnon's Eighth Amendment claims against former Secretary Jones and Warden Clemmons are based solely on his assertion that the FDOC has a policy or

custom of prioritizing count over inmates' medical needs. In support of his assertion, McKinnon alleges Defendants Scheier and Carrico stated, "Count is more important!" in response to the pleas of other inmates for medical attention for McKinnon. Defendants dispute that such a custom or policy exists, citing to the FDOC's administrative regulations set forth in the Florida Administrative Code (*see* ECF No. 125).

The court has reviewed the FDOC's administrative regulations and finds no policy which prioritizes "count" over inmates' medical needs. Further, McKinnon has not come forward with any evidence that such a custom or policy exists. The mere fact that Defendants Scheier and Carrico stated that count was more important does not plausibly suggest that either Warden Clemmons or former Secretary Jones adopted a policy or custom of delaying medical attention to inmates with urgent medical needs in the interest of completing count.

Viewing the facts in McKinnon's favor, he has not shown that either Warden Clemmons or former Secretary Jones acted with deliberate indifference to his medical needs. Therefore, both of these Defendants are entitled to judgment in their favor.

C.    **Defendants Tuttle, Jackson, Hullett, Scheier, and Carrico**

McKinnon contends Defendants Tuttle, Jackson, Hullett, Scheier, and Carrico ("Defendant Officers") deliberately delayed his medical treatment in order to fulfill other responsibilities, including feeding inmates lunch and conducting count.  The Defendant Officers contend they are entitled to qualified immunity on McKinnon's claims (ECF No. 125 at 22–24).

The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.  Ct. 2727, 73 L. Ed. 2d 396 (1982).  When the affirmative defense of qualified immunity is advanced, the complaint must be dismissed unless "the plaintiff's allegations state a claim of violation of clearly established law." *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotation marks and citation omitted).  Absent such allegations, it is appropriate for a district court to grant the defense of qualified immunity.  *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003) ("It is . . . appropriate for a district court to grant the defense of qualified immunity at the motion to dismiss stage.").

To receive qualified immunity, a defendant must first prove that he or she was acting within the scope of his or her discretionary authority when the relevant

conduct took place. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). If the defendant satisfies that burden, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate. *Lee*, 284 F.3d at 1194. In resolving questions of qualified immunity, courts engage in a two-pronged inquiry. *See Tolan v. Cotton*, 572 U.S. 650, 655, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014). "The first asks whether the facts, taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right. . . . The second . . . asks whether the right in question was 'clearly established' at the time of the violation." *Tolan*, 572 U.S. 65906 (citations, internal quotation marks, and alterations omitted) (first ellipsis in original). The court has discretion to decide which question to address first. *See Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

Qualified immunity protects all but the plainly incompetent or those who knowingly violate federal law; it does not extend to one who knew or reasonably should have known that his or her actions would violate the plaintiff's federal rights. *See Jones v. Fransen*, 857 F.3d 843, 851 (11th Cir. 2017) (citations and quotation marks omitted). The defense gives government officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al–Kidd*, 563 U.S. 731, 743, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011). In part, this

defense recognizes the problems that government officials like correctional officers face in performing their jobs in dynamic and sometimes perilous situations. It is also designed to avoid excessive disruption of government services and to provide a direct way to end insubstantial claims early in the litigation. *See id.*

Because § 1983 "requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation," *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam) (citation omitted), each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions. "So [the court] must be careful to evaluate a given defendant's qualified-immunity claim, considering only the actions and omissions in which that particular defendant engaged." *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018).

The clearly established law requirement provides government officials with the ability to anticipate what conduct will give rise to liability for a constitutional violation. *See Anderson v. Creighton*, 483 U.S. 635, 646, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). To that end, when officials are acting within their discretionary capacity, they "can know that they will not be held personally liable as long as their actions are reasonable in light of current American law." *Id.* "A Government official's conduct violates clearly established law when, at the time of the challenged

conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Al-Kidd*, 563 U.S. at 741 (quoting *Anderson*, 483 U.S. at 640) (emphasis added). "We do not require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *Id.* This imposes an objective standard, and that objective standard is "measured by reference to clearly established law." *Harlow*, 457 U.S. at 818.

Because this objective standard is fundamental to the qualified immunity defense, the district court should determine if the law was clearly established at the time the incident occurred. As the Supreme Court explained:

> If the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful . . . . If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.

*Harlow*, 457 U.S. at 818–19. In this way, both government officials and citizens are protected. If the law is not clearly established, then the court should dismiss the case against the government official. If the law was clearly established, then the claim against the government official should go forward.

Furthermore, recognizing that the clearly established law question turns on the law at the time of the incident, the district court must consider the law "in light of the specific context of the case, not as a broad general proposition . . . ." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). In other words, the facts of the case before the court must be materially similar to the facts in the precedent that clearly establishes the deprivation. *See Merricks v. Adkisson*, 785 F.3d 553, 559 (11th Cir. 2015) (citation omitted). To be clearly established, the precedent must give officials clear warning of unconstitutional conduct. *Id.*

In considering the law to do this analysis, the district court should compare the facts of the case before the court that allege a constitutional deprivation with those cases that the party opposing the motion contends show the clearly established nature of the law. As the Eleventh Circuit has explained:

> For qualified immunity purposes, a pre-existing precedent is materially similar to the circumstances facing the official when the specific circumstances facing the official are enough like the facts in the precedent that no reasonable, similarly situated official could believe that the factual differences between the precedent and the circumstances facing the official might make a difference to the conclusion about whether the official's conduct was lawful or unlawful, in the light of the precedent. Thus, every fact need not be identical. Minor variations in some facts (the precedent lacks arguably significant fact or contains an additional arguably significant fact not in the circumstances now facing the official) might be very important and, therefore, be able to make the circumstances facing an official materially different than the pre-existing precedents, leaving the law

applicable—in the circumstances facing the official—not clearly established when the defendant acted.

*Merricks*, 785 F.3d at 559 (internal quotation marks omitted).

The Supreme Court recently observed:

> In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases. The Court has found this necessary both because qualified immunity is important to society as a whole, and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial.

> Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined at a high level of generality. As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

*White v. Pauly*, — U.S. —, 137 S. Ct. 548, 551–52, 196 L. Ed. 2d 463 (2017) (multiple citations, some quotation marks, and alterations omitted).

It must be noted that the court may not consider just any case law to decide if a right was clearly established. Only binding opinions from the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the highest court in the state where the action is filed, can serve as precedent for this analysis. *See McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).

Here, Defendants submit they were acting within their discretionary authority during the course of the incident at issue (*see* ECF No. 125 at 23).  McKinnon does not dispute that the Defendant Officers were acting within the scope of their discretionary authority as FDOC correctional officers when the alleged constitutional violation occurred.  Therefore, the burden shifts to McKinnon to satisfy the two-prong qualified immunity standard by showing that:  (1) the facts show that each Defendant violated his Eighth Amendment right, and (2) the right was clearly established on December 13, 2017.

Defendants do not dispute that McKinnon's diabetes constitutes a serious medical need; therefore, he has met the objective prong of the Eighth Amendment standard (*see* ECF No. 125 at 12).[2]  Defendants, however, argue McKinnon has not shown a genuine issue of material fact on the subjective component of the Eighth Amendment standard, and that they are entitled to judgment as a matter of law.

### 1.    Defendants' Conduct *Prior to* McKinnon's Initial Visit to Medical

Defendants do not dispute McKinnon's factual allegations regarding the circumstances that existed from 11:20 p.m. to 12:00 p.m. on December 13, 2017,

---

[2] Indeed, this court has stated before that "diabetic emergencies undoubtedly constitute a serious medical need."  *Boynton v. City of Tallahassee*, No. 4:14cv292-MW/CAS, 2015 WL 12938933, at *4 n.4 (N.D. Fla. July 22, 2015), *rev'd on other grounds,* 650 F. App'x 654 (11th Cir. May 24, 2016).

which was the 30–40-minute period **prior to** the officers' taking McKinnon to the medical triage room for assessment and treatment. Defendants dispute only McKinnon's factual allegations with respect to what occurred **after** he arrived at the medical triage room (*see* ECF No. 125 at 8–12). The court thus assumes as true, at the summary judgment stage, McKinnon's description of the circumstances which existed prior to his arrival at the medical triage room at 12:00 p.m.

Viewing the circumstances in the light most favorable to McKinnon, a reasonable jury could conclude that each Defendant Officer was deliberately indifferent to McKinnon's serious medical needs. These circumstances show that each Defendant Officer knew that McKinnon was diabetic and experienced hypoglycemic episodes, and that each observed McKinnon lying unresponsive in his cell. The obviousness of McKinnon's need for immediate medical attention may be inferred from the fact that other inmates pleaded with all of the Defendant Officers to immediately respond to McKinnon's condition. It also may be inferred from Nurse Williams' reaction upon seeing McKinnon when the officers finally transported him to the medical triage room—Nurse Williams exclaimed, "Oh my God! He's one step away from a coma!" Despite the obviousness of McKinnon's need for immediate treatment, none of the Defendant Officers immediately sought it—in fact, each Defendant delayed medical treatment for non-medical reasons.

Defendants Tuttle and Jackson chose to continue to feed lunch to the entire housing wing before they took any responsive action.  Defendant Hullett chose to walk in and out of the wing twice before he took any action.  And Defendants Scheier and Carrico chose to continue with count.  When prison officials ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference.  *See Bozeman v. Orum*, 422 F.3d 1265, 1273–74 (11th Cir. 2005) (affirming denial of summary judgment to prison guards where there was an unexplained fourteen-minute delay in providing medical care to an unconscious, non-breathing prisoner), *abrogated on other grounds by Kingsley v. Hendrickson*, — U.S. —, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015); *Lancaster v. Monroe Cnty., Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997) (holding that a jury could infer prison officials' subjective disregard of an inmate's risk of having a seizure because the officials delayed treatment for the inmate even after being told by the inmate's relative that the inmate was likely to have a seizure and had recently been hospitalized for seizures), *overruled on other grounds by LeFrere v. Quezada*, 588 F.3d 1317 (11th Cir. 2009); *Brown*, 894 F.2d 1538–39 (reversing grant of summary judgment to prison officials where there was an unexplained delay of six hours in treating a prisoner's broken foot).  Viewing the facts in the light most

favorable to McKinnon, a reasonable jury could conclude that each Defendant Officer was deliberately indifferent to McKinnon's serious medical need.

Defendants next argue that McKinnon failed to satisfy the second prong of the qualified immunity analysis (*see* ECF No. 125 at 23), i.e., that any Defendant had fair warning that his conduct violated McKinnon's Eighth Amendment right.

It was clearly established by December 13, 2017, that an official acts with deliberate indifference when he intentionally delays medical attention for a medical need that is obvious even to a layperson because it involves a life-threatening condition or a situation where it is apparent that delay would exacerbate the medical problem. *Valderrama v. Rousseau*, 780 F.3d 1108, 1121–22 (11th Cir. 2015); *Lancaster*, 116 F.3d at 1425 (citing *Hill*, 40 F.3d at 1187); *Bozeman*, 422 F.3d at 1274. For purposes of qualified immunity, however, the pre-existing law must give officials some sense of what amount of time constitutes actionable delay in order for the law to be established with the particularity required by the qualified immunity analysis. *See Harris*, 21 F.3d at 393.

The undersigned concludes that for an emergency medical need like McKinnon's, the law was clearly established, by December 13, 2017, that 30–40 minutes was too long to fail to respond to McKinnon's medical need. *See, e.g., Valderrama*, 780 F.3d at 1120–23 (ten-to-eleven-minute delay in seeking medical

treatment for gunshot wound constituted deliberate indifference); *Bozeman*, 422 F.3d at 1273–74 (fourteen-minute delay in providing medical care for unconsciousness violated the Constitution); *Brown*, 894 F.2d at 1538–39 (four-hour delay in providing medical care for broken foot stated a prima facie case of deliberate indifference); *Aldridge*, 753 F.2d at 972–73 (two-and-a-half-hour delay in providing medical care for bleeding cut that required six stitches stated a prima facie case of deliberate indifference).  The contours of unreasonable delay were defined with enough particularity to allow a reasonable officer in each Defendant's circumstances to understand that his intentionally delaying treatment for a nearly unconscious diabetic inmate for any period of time for a nonmedical reason was unlawful. McKinnon has shown sufficient facts to overcome Defendants Tuttle, Jackson, Hullett, Scheier, and Carrico's entitlement to qualified immunity in their individual capacities.[3]

### 2.    Defendants' Conduct *After* McKinnon's Initial Visit to Medical

Although McKinnon has overcome Defendants Tuttle, Jackson, Hullett, Scheier, and Carrico's assertion of qualified immunity with respect to their 30–40-

---

[3] It is important to remember that a ruling denying qualified immunity does not render Defendants liable for deliberate indifference.  It means only that McKinnon's claims against them may proceed to trial.  *See Harris*, 21 F.3d at 394 (citation omitted).

minute delay in initially taking him for medical treatment, McKinnon has not satisfied the qualified immunity analysis with respect to his allegations that Defendants delayed his medical treatment after that point.  According to the unrefuted medical evidence, including Dr. Santiago's declaration and McKinnon's medical records, there was no delay in McKinnon's medical treatment once he received his initial assessment in the medical triage room at 12:00 p.m.  At that time, McKinnon was treated in accordance with the FDOC's Diabetes Protocol. McKinnon received one dose of oral glucose, and a second dose 30 minutes later, when his blood sugar level was still below 60.  The second dose of glucose returned McKinnon's blood sugar level to a medically acceptable level (above 60), and he required no additional treatment.  McKinnon has failed to demonstrate a genuine issue of material fact as to whether his medical treatment was delayed after his initial visit to medical at 12:00 p.m.—it was not.  Therefore, Defendants are entitled to qualified immunity with respect to this aspect of McKinnon's Eighth Amendment claim.

### 3.    Available Relief

This leaves the question of the relief to which McKinnon may be entitled. Defendants contends McKinnon has not established the necessary factors for the issuance of a permanent injunction. (ECF No. 125 at 17–21).  Additionally,

Defendants contend McKinnon is barred from recovering compensatory, punitive, or emotional damages, under 42 U.S.C. § 1997e(e), because he did not allege he suffered any physical injury as a result of the delay in receiving medical treatment (*id.* at 13–17). Defendants contend at worst, this case involves a "temporary and slight aggravation" of McKinnon's pre-existing diabetes, which is not more than de minimis (*id.* at 16–17).

a.    Permanent Injunction

McKinnon seeks permanent injunctive relief, specifically, an order (1) abolishing the "policy/custom" of prioritizing "count" over the provision of medical treatment to inmates, (2) re-implementing the 2,800-calorie therapeutic diet, consisting of three meals and a snack between each meal, (3) requiring the FDOC to house all diabetic inmates at Santa Rosa C.I. and other Close Management institutions in the same housing unit, and (4) establishing a "response time" for treatment of hypoglycemic emergencies (*see* ECF No. 84 at 18).

In order to obtain permanent injunctive relief, the plaintiff must show (1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right; (3) irreparable harm will result if the court does not order injunctive relief; and (4) if issued, the injunction would not be adverse to the public interest. *See Thomas v. Bryant*, 614

F.3d 1288, 1317 (11th Cir. 2010) (citations omitted).  Regarding "irreparable harm,"

the injury must not be remote or speculative, but actual and imminent.  *Northeastern*

*Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*,

896 F.2d 1283, 1285 (11th Cir. 1990) (citation omitted).  In addition to ensuring that

injunctive relief was necessary under this standard, the court must also ensure that

the scope of the awarded relief does not exceed the identified harm.  *See Thomas*,

614 F.3d at 1317 (citing *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S. Ct. 2545,

61 L. Ed. 2d 176 (1979) ("[T]he scope of injunctive relief is dictated by the extent

of the violation established . . . .").

　　In the context of prison litigation, the court must also consider the

requirements of the Prison Litigation Reform Act, 18 U.S.C. § 3626 ("PLRA"),

which "establishes standards for the entry and termination of prospective relief in

civil actions challenging prison conditions," *Miller v. French*, 530 U.S. 327, 331,

120 S. Ct. 2246, 147 L. Ed. 2d 326 (2000).  The PLRA mandates that injunctive

relief is only appropriate where it is "narrowly drawn, extends no further than

necessary to correct the violation of the Federal right, and is the least intrusive means

necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1)(A).

　　Here, McKinnon is not entitled to an injunction abolishing the

"policy/custom" of prioritizing "count" over the provision of medical treatment to

inmates.  As discussed *supra*, McKinnon has not shown that such a policy or custom

exists.  Therefore, granting such injunctive relief would be meaningless.

Granting the remaining injunctive relief requested by McKinnon would

extend further than necessary to correct the alleged Eighth Amendment violation.

As previously discussed, and based upon the affidavit of Dr. Santiago, there is no

evidence of a causal connection between McKinnon's hypoglycemic episode and

the absence of 2,800-calorie therapeutic diet, consisting of three meals and a snack

between each meal.  Therefore, an injunction reinstating the diet would not meet the

"narrowly tailored" requirement.

The same is true of McKinnon's request for an injunction requiring the FDOC

to house all diabetic inmates at Santa Rosa C.I. and other Close Management

institutions in the same housing unit.  McKinnon has not shown that the failure to

house him with only diabetic inmates had any effect on the officers' response time

in taking him to the medical department.

McKinnon's request for an injunction establishing a "response time . . . for

hypoglycemic emergencies" is a closer call, but the undersigned concludes that

McKinnon has failed to show he will suffer irreparable harm if the court does not

order the FDOC to establish a response time for hypoglycemic emergencies.  Dr.

Santiago states, and McKinnon's medical records demonstrate, during the 10-month

period preceding the hypoglycemic episode at issue, McKinnon had eighteen (18) hypoglycemic episodes, and six (6) hyperglycemic episodes. McKinnon does not allege that medical treatment was delayed during any of those episodes, when there was no policy in place establishing a response time. The one hypoglycemic episode at issue in this case appears to be nothing more than an isolated incident, not an indication that McKinnon will suffer any harm, let alone irreparable harm, unless the court grants the permanent injunction he requests.

McKinnon has failed to satisfy the standard for granting the permanent injunctive relief he seeks. Therefore, even if McKinnon succeeds at trial on his limited Eighth Amendment claim against the Defendant Officers, he is not entitled to injunctive relief.

b.    Monetary Damages

Defendants are correct that McKinnon's monetary damages claims against them in their official capacities are barred by the Eleventh Amendment. *See Miller v. King*, 384 F.3d 1248 (11th Cir. 2004) (a plaintiff may not bring a § 1983 action for monetary damages against the state or state officials in their official capacities). Absent waiver or express congressional abrogation, the Eleventh Amendment prohibits a suit brought by a private individual against a state in federal court. *See Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 765–78, 122 S. Ct. 1864,

152 L. Ed. 2d 962 (2002); *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985); *Gamble v. Fla. Dep't of Health and Rehab., Serv.*, 779 F.2d 1509, 1511 (11th Cir. 1986). A suit against a state employee in his official capacity is deemed to be a suit against the state for Eleventh Amendment purposes. *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). Therefore, McKinnon's claims for monetary damages against Defendants in their official capacities must be dismissed.

McKinnon also seeks compensatory, punitive, and nominal damages against Defendants in their individual capacities for alleged physical and mental or emotional injuries he suffered as a result of the Defendant Officers' delay in seeking medical treatment. Defendants contends McKinnon is not entitled to compensatory, punitive, or emotional damages, pursuant to 42 U.S.C. § 1997e(e).

Title 42 U.S.C. § 1997e(e) provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." The Eleventh Circuit has decided that the phrase "Federal civil actions" means all federal claims, including constitutional claims. *Napier v. Preslicka*, 314 F.3d 528, 532 (11th Cir. 2000) (citation omitted). Where a prisoner plaintiff alleges constitutional violations, he is prevented under § 1997e(e) from seeking punitive or

compensatory damages in the absence of a physical injury. *Smith v. Allen*, 502 F.3d 1255, 1271 (11th Cir. 2007) *abrogated on other grounds by Sossamon v. Texas*, 563 U.S. 277, 131 S. Ct. 1651, 179 L. Ed. 2d 700 (2011)); *see also Al-Amin v. Smith*, 637 F.3d 1192, 1199 (11th Cir. 2011) (noting that *Napier* court, by affirming dismissal of Napier's entire claim, "concluded, albeit sub silentio, that Napier's punitive claim was barred by § 1997e(e) just as much as his compensatory claim."). Nominal damages, however, may still be recoverable. *Smith*, 502 F.3d at 1271.

"In order to avoid dismissal under § 1997e(e), a prisoner's claims for emotional or mental injury must be accompanied by allegations of physical injuries that are greater than *de minimis*." *Mitchell v. Brown & Williamson Tobacco Corp.*, 294 F.3d 1309, 1312–13 (11th Cir. 2002). In *Harris v. Garner*, the Eleventh Circuit stated, "We therefore join the Fifth Circuit in fusing the physical injury analysis under section 1997e(e) with the framework set out by the Supreme Court in *Hudson* [*v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)] for analyzing claims brought under the Eighth Amendment for cruel and unusual punishment, and hold that in order to satisfy section 1997e(e) the physical injury must be more than *de minimis*, but need not be significant." 190 F.3d 1279, 1286 (11th Cir. 1999), *reh'g en banc granted and opinion vacated*, 190 F.3d 1059 (11th Cir. 1999), *opinion reinstated in relevant part en banc*, 216 F.3d 970 (11th Cir. 2000). Under binding

circuit precedent, this court therefore must "fus[e] the physical injury analysis under section 1997e(e) with the framework set out by the Supreme Court in *Hudson* for analyzing claims brought under the Eighth Amendment for cruel and unusual punishment." *Id.*

Defendants cite two cases from courts in the Eleventh Circuit in support of their contention that the temporary aggravation of a pre-existing medical condition is not more than a *de minimis* injury. One case is *Norfleet v. Taylor*, 3:16cv413/MCR/EMT, 2017 WL 7054010, at *17 (N.D. Fla. Nov. 27, 2017) (*see* ECF No. 125 at 16). However, in that case, the district court determined that summary judgment was **not** appropriate on the issue of compensatory and punitive damages, because there was a genuine dispute of material fact concerning whether the inmate's alleged physical injuries were *de minimis*. *See* 2017 WL 7054010 , at *18, *Report and Recommendation Adopted By* 2018 WL 564859 (N.D. Fla. Jan. 25, 2018).

Defendants also cite *Dixon v. Toole*, 225 F. App'x 797, 798 (11th Cir. 2007) (*see* ECF No. 125 at 16). In that case, the Eleventh Circuit held that dismissal of the inmate's claim for compensatory damages was proper where the inmate failed to put forth any evidence to support his allegations that his sleeping on a concrete platform aggravated a preexisting condition or exposed him to Hepatitis C. However, *Dixon*

did not involve a delay in providing medical treatment for an urgent medical need, which is the case here.

Hypoglycemia or diabetic shock is a state of physical crisis. And McKinnon's persisting in a state of physical crisis for 30–40 minutes is more than *de minimis* physical injury. Therefore, the nature and amount of monetary damages to which McKinnon may be entitled should be left to the fact finder.

Accordingly, it is respectfully **RECOMMENDED**:

1.     That Defendants' motion for summary judgment (ECF No. 125) be **GRANTED IN PART AND DENIED IN PART** as follows:

a.     Defendants' motion for summary judgment be **GRANTED** as to Plaintiff's claims against Defendants Gaskins, Jones, and Clemmons;

b.     Defendants' motion for summary judgment be **DENIED** as to Plaintiff's claims for monetary damages against Defendants Tuttle, Jackson, Hullett, Scheier, and Carrico in their individual capacities based upon their 30–40-minute delay in taking Plaintiff for **initial** medical treatment;

c.     Defendants' motion for summary judgment be **GRANTED** as to Plaintiff's claims for monetary damages against Defendants Tuttle, Jackson, Hullett, Scheier, and Carrico in their individual capacities based upon their conduct **after** they took Plaintiff for initial medical treatment;

Case No.:  3:18cv1191/LAC/EMT

d.      Defendants' motion for summary judgment be **GRANTED** as to Plaintiff's claims for monetary damages against Defendants in their official capacities;

e.      Defendants' motion for summary judgment be **GRANTED** as to Plaintiff's claims for a permanent injunction;

2.      That this case be recommitted to the undersigned for pre-trial proceedings on Plaintiff's claims against Defendants Tuttle, Jackson, Hullett, Scheier, and Carrico in their individual capacities based upon their 30–40-minute delay in taking Plaintiff for initial medical treatment.

At Pensacola, Florida this <u>20th</u> day of February 2020.

*/s/ Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>. A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**